UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

FLAGLER AUTOMOTIVE, INC., et al.,     :

                       :         **MEMORANDUM AND ORDER**

            Plaintiffs,   :

                       :       06-CV-06599 (ENV) (RML)

    -against-         :

                       :

EXXON MOBIL CORPORATION,    :

                       :

            Defendant.   :

                       :

------------------------------------------------------------------- x

VITALIANO, D.J.

      This is a commercial family dispute pitting a group of current and former service station

operators against their supplier of gasoline. Defendant Exxon Mobil Corporation ("Exxon")

seeks summary judgment in what is also a putative class action. For the reasons set forth below,

the motion is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

      One of America's most widely recognized brand names, Exxon, of course, is a supplier

of gasoline products.[1] The named plaintiffs are ten former operators of Exxon service stations

located in New York, Maryland, and Pennsylvania. Each plaintiff purchased at wholesale

gasoline from Exxon pursuant to written sales agreements that gave Exxon the right to set the

price of the delivered gas unilaterally.[2] Plaintiffs claim that Exxon breached its contractual and

statutory duties of good faith under these sales agreements when it included in its gasoline

pricing the costs of an incentive-based rebate program that it provided to plaintiffs, effectively

---

[1] Unless otherwise noted, the facts in this section are undisputed.

[2] Each of the plaintiffs in the case (with the exception of one, who owned his station outright) was also a lessee of Exxon and subject to a separate lease agreement governing the lessor-lessee relationship. Except as noted, the terms of those lease agreements are not relevant to this litigation.

negating (according to plaintiffs) the benefits of those rebates.[3] Exxon argues that the sales

agreements did not prohibit it from recovering its variable costs of doing business, including the

cost of the rebates, in setting the price of gasoline delivered to dealers. On the ground that it did

not breach any contractual or statutory duty as a matter of law, Exxon seeks summary judgment.[4]

## I.    The Sales Agreements and Gasoline Purchases

For present purposes, each of the sales agreements (sometimes referred to as PMPA

agreements)[5] between plaintiffs and Exxon are consistent in all relevant terms. Pursuant to those

agreements, plaintiffs agreed to pay Exxon the "price in effect" for gasoline at the time of

loading of the delivery vehicle, also known in the industry as the "DTW" ("dealer tank wagon")

or "DTT" ("dealer tank trunk") price.[6] Plaintiffs would then set their own retail prices at which

they sold the gas. The parties do not dispute that (1) the sales agreements gave Exxon the sole

right to fix the DTW price, subject only to contractual and statutory obligations of good faith,

and (2) the agreements were all fully integrated and contained non-modification clauses.[7]

---

[3] As will be discussed further, plaintiffs seek to represent a class of all similarly situated Exxon retail dealers (except those in Texas) who purchased their Exxon-branded motor fuels from Exxon. Plaintiffs have not yet moved for class certification in this Court.

[4] Exxon also seeks summary judgment on the grounds that plaintiffs are time-barred from bringing their claims; that plaintiffs breached their contractual duty to give timely notice of their disputes; and that plaintiffs' claims are barred by the terms of a class action settlement in Allapattah Services, Inc. et al. v. Exxon Corp., Case No. 91-0986-Civ-Gold (S.D. Fla.). Given that plaintiffs are nonsuited, the Court does not need to reach the merits of these additional arguments.

[5] The federal Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2801-2806, governs various aspects of contracts between gasoline suppliers and retailers. Plaintiffs are not pursuing any PMPA claims.

[6] For example, one of the sales agreement stated that "BUYER shall pay SELLER for all delivered PRODUCTS SELLER's price in effect at the time of loading of the delivery vehicle."

[7] For example, one of the sales agreements provided: "ENTIRE AGREEMENT: This writing is intended by the parties to be the final, complete and exclusive statement of their agreement about the matters covered herein. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS, OR WARRANTIES AFFECTING IT." That agreement also provided: "This contract may be modified only by a writing signed by both of the parties or their duly

Generally, as a matter of practice, when Exxon delivered gasoline to a dealer, it would fax an invoice showing the DTT price it charged for each grade of gasoline delivered. The invoices did not provide the dealers with any information about what factors went into or the method of Exxon's calculation of the DTT price.

## II.    The Rebate Program

In the late 1980s and early 1990s, Exxon rolled out an incentive-based rebate program that it maintained in various forms until the early 2000s. The programs provided "cents per gallon" ("cpg") rebates to dealers based either on volume (i.e., if the dealer's sales of gasoline surpassed certain volume thresholds) or on hours (i.e., if the dealer kept the station open 24 hours a day). The purpose of both types of rebate programs was to give dealers incentive to boost the volume of gas they sold, whether by lowering retail prices, offering promotions, keeping stations open later, or improving the quality of a station's services and image.

Exxon introduced and explained these rebate programs during meetings with and presentations to dealers. It also initiated various other written and oral rebate-related communications. For instance, Exxon would send dealers new schedules each quarter showing how much gasoline they had to sell in order to earn specified cpg rebates. The cpg rebate amounts differed according to type of gas and threshold levels of volume of sales, which were based on historical averages in particular geographical markets. In explaining the rebates, Exxon territory managers and sales personnel also performed sample calculations for dealers under different volume scenarios and showed dealers how they could lower their retail prices to sell larger volumes of gas and still get the benefit of a larger "pool margin" (gross profit across all gasoline grades) because of the rebate payments. With similar focus on the station hours

authorized agent."

3

program, Exxon explained to dealers how rebates based on hours of operation would help offset the expenses of being open extended hours. As the dealers met volume threshold levels and/or complied with their commitments to keep stations open 24 hours daily,[8] they would receive the cpg rebates in the form of credits on their monthly rent invoices for what they had earned in the prior month. (For those dealers who were not lessees, dealers would receive credits directly on the motor fuel product invoices).[9] The parties agree, more importantly, that the rebate programs were never explicitly made part of the sales agreements and that Exxon retained the right to change or discontinue the rebate programs at any time. Plaintiffs also agree that they did receive rebates from Exxon every month that they qualified for them.

### III.     Inclusion of the Costs of the Rebate Programs in DTT Pricing

In setting DTT prices, Exxon used price zones based on the geographical area in which one or more dealers were located. Price zones were also grouped in urban markets (e.g., Philadelphia). Absent some adjustment for a particular dealer, the DTT within a price zone applied to all dealers operating in that territory. The process that Exxon used to calculate DTT prices in any given zone was, to be sure, highly complex and depended on a multiplicity of factors, including the prices charged by Exxon's competitors. Regardless the other price determinants, for purposes of this motion, Exxon does not dispute that, during the periods that the rebate programs were in effect, Exxon would generally include amounts in its DTT prices to

---

[8] Eight of the plaintiffs in this case had separate lease agreements that already required them to stay open 24 hours per day. Those plaintiffs also received the rebates from Exxon for staying open 24 hours notwithstanding.

[9] Though not relevant to the disposition of the instant motion, rebate conversations between Exxon and its station operators were not necessarily monologues. For example, some dealers would keep track of the rebates they were earning every month and would notify Exxon if it had calculated their rebates incorrectly on the invoices; further, in some cases, upon a particular dealer's request, Exxon would adjust the particular volume threshold levels for that dealer in order to take into account certain variables (such as increased competition in the area) so that the dealer could maintain the benefits of the rebates.

recoup the average cpg rebates it paid in particular markets in the prior month. Given Exxon's concession that a rebate program "add-on" was taken into account when Exxon set DTT prices, plaintiffs contend that dealers who earned rebates under these programs actually ended up being worse off than under the pre-rebate pricing scheme and, if not, then "netting" only zero or, at best, netting less than the rebates appeared to provide.[10]

The record also demonstrates without contest that Exxon generally did not discuss the DTT add-on in its written or verbal communications to dealers about the rebate programs. Although plaintiffs have not submitted evidence of any direct misrepresentations by Exxon or of any explicit promise, they have submitted evidence of representations by Exxon which, they contend, amounted to promises by Exxon that it would not include the costs of the rebates in DTT pricing. For example, plaintiffs note that in their written and oral communications about the rebate programs, Exxon managers and sales staff would generally stress how much dealers would "earn" or "enhance their profitability" if they lowered their prices to achieve specified volume levels and, as a result, receive rebates. Exxon sales representatives also characterized the programs as "win-win" for dealers and as "financial assistance" to dealers – all without disclosing that Exxon was recouping the costs of the rebate program in the DTT price.[11] The silence, plaintiffs seek to show, was not coincidental. Plaintiffs point to evidence that Exxon

_____

[10] According to plaintiffs, dealers who earned the average amounts of rebates or less in their particular market netted zero or less when taking into account the DTT add-ons, whereas only dealers who earned above average rebates would actually net positive amounts after taking into account the add-ons (but still less than the rebates appeared to provide).

[11] By way of contrast, plaintiffs have submitted evidence that for another incentive program, "Discount for Cash" (DFC), Exxon explicitly informed dealers that it would reduce DTT by the costs of credit card processing (and even showed this reduction as a line item on gasoline invoices); further, when Exxon eliminated DFC in 1994, Exxon clearly told dealers that it was eliminating the corresponding reduction in DTT. Thus, plaintiffs contend, it was reasonable for the dealers to expect that, if the rebate programs at issue also had an effect on DTT pricing, Exxon would have informed them.

managers and sales personnel may have been specifically advised against communicating DTT changes in discussing the rebates with dealers. Silence, in any event, invited reliance, the argument goes, and is, at least, powerful evidence of a mutual understanding or, alternatively, bad faith.

## IV.    Procedural History

On June 23, 2004 former plaintiff Flagler Automotive, Inc. filed this action in the United States District Court for the Southern District of Florida seeking certification of a multi-state dealer class, excluding Texas dealers.[12] Jurisdiction was based on diversity of citizenship.[13] Exxon moved for summary judgment in that court on April 28, 2005, and plaintiffs moved for class certification on May 19, 2005. On February 9, 2006, Magistrate Judge Barry K. Garber issued a report and recommendation (R&R) concluding that plaintiff Flagler's individual claims were barred by the Florida statute of limitations, that plaintiff Seminary Hill's individual claims were barred by the Maryland statute of limitations (at that time, Flagler and Seminary Hill were the only named plaintiffs), and recommended entry of summary judgment against both plaintiffs and denial of plaintiffs' class certification either as moot or, in the alternative, on the merits because of the recommendation on limitations.

On July 5, 2006, United States District Judge Federico Moreno granted plaintiffs' motion

---

[12] On January 9, 2003, prior to this case being filed, a nearly identical lawsuit was filed under the caption Gill v. Exxon Mobil, No. 03-60079-4, in the County Court of Nueces County, Texas, alleging a multi-state class of dealers. When Flager was filed, it excluded Texas dealers from its class definition, and the Gill complaint was subsequently amended to limit the certification request there to a Texas-only class. The Gill class has now been certified, the Texas Court of Appeals has affirmed that certification decision, and Exxon has appealed it to the Texas Supreme Court.
[13] Plaintiff Flagler was a citizen of Florida and plaintiff Seminary Hill Service Center, Inc., a citizen of Maryland. Exxon is incorporated in New Jersey and has its principal place of business in Texas. Flagler's claims have since been dismissed. The current named plaintiffs are citizens of New York, Pennsylvania, and Maryland.

for leave to file their Third Amended Complaint, the operative complaint here,[14] to add new dealer plaintiffs from New York and Pennsylvania. On August 24, 2006, Judge Moreno adopted the Magistrate Judge's R&R in part, granting summary judgment as to Flagler's claims under Florida law but denying summary judgment on Seminary's Hill's claims under Maryland law. As Judge Moreno had granted summary judgment on the claims of the only Florida-based plaintiff, on December 6, 2006, he granted Exxon's motion to transfer venue to this district. The transfer order denied all pending motions as moot, with leave to re-file in the transferee court.

After transfer to this Court, defendant brought the instant motion for summary judgment. Subsequently, two of the named plaintiffs in this case, John Holbrook and Samuel Verner, indicated to the Court that they would not oppose entry of summary judgment against them.[15] The remaining plaintiffs, on the other side of the ledger, have indicated their intent to file a renewed motion for class certification but only after a ruling on the instant motion for summary judgment.

## DISCUSSION

The dealers claim that Exxon breached its good faith obligations under the sales agreements and the Uniform Commercial Code (which governs all the sales agreements at issue

---

[14] For ease of reference, the Court uses "Compl." to refer to plaintiffs' Third Amended Complaint.

[15] Holbrook and Verner were plaintiffs in another lawsuit, Verner v. Exxon Company, U.S.A., Case No. 96-1353 (W.D. Pa.), in which a group of dealers sued to enjoin Exxon from assigning their franchise agreements to Mon Valley Petroleum, Inc. The dealers claimed in part that the assignments would deprive them of the rebates they were receiving under Exxon's incentive programs. On September 5, 1996, an Exxon executive specifically testified at a preliminary injunction hearing that rebate costs were added to the DTT price. Although Holbrook and Verner aver that they do not recall hearing that testimony at the time, having reviewed that testimony now, they do not oppose summary judgment against them. (Implicitly acknowledging, that is, that they were on notice of their claims in this case as of the 1996 hearing, and therefore are now time-barred under the Uniform Commercial Code's four-year statute of limitations from bringing their breach of contract claims.)

7

here)[16] by "covertly inflating the DTT in order to recoup the rebates." (Compl. ¶¶ 38, 42). They claim that the rebates were "false and illusory" because "[w]hat Exxon gave publicly with one hand, it recouped secretly with the other." (Id. ¶ 27). They claim that Exxon "deliberately and secretly added to the DTT price per gallon in order to entirely offset and negate the promised rebates" that its dealers had earned, and that Exxon would periodically "review the results and readjust the rebate adders to ensure that it was recapturing all of its rebates by way of the hidden add-ons to its DTT price." (Id. ¶ 28). Plaintiffs therefore advance causes of action for (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing under the UCC; and (3) breach of promise.[17]

Exxon counters that the rebate programs were not made part of the sales agreements, which were fully integrated and contained no-modification clauses, and that they expressly retained the right to change or discontinue the programs at any time. Moreover and without equivocation, Exxon argues that it had the right under the respective sales agreements to unilaterally determine the DTT price, including the right to pass on any and all of its costs to its customers. Lastly, Exxon argues that it did not breach its duty of good faith under the UCC as a matter of law, because there is neither allegation nor any showing by the dealers that it discriminated in its pricing, or that its prices were outside the range of its competitors in any market, or that it promised the dealers that it would not include the cost of its rebates in the DTT

---

[16] New York, Maryland, and Pennsylvania have adopted the same relevant UCC provisions. It is uncontested that the UCC governs the subject contractual relations. For ease of reference, this opinion generally cites the UCC as promulgated by the uniform commission without parallel cites to each state's codification of those provisions.

[17] Plaintiffs have agreed to withdraw count three's independent claim for breach of promise and have also stipulated that count two, for breach of the UCC's duty of good faith, can also be effectively addressed in count one's claim for breach of contract. See Tr. of Sept. 3, 2008 Oral Arg. at 51:3-14. Therefore, the Court treats plaintiffs' complaint as alleging only one cause of action – that for breach of contract.

price.

## I.    **Summary Judgment Standard**

Under the Federal Rules of Civil Procedure, a court must grant summary judgment upon finding, based on the pleadings, depositions, interrogatory answers, admissions, and affidavits that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). In determining whether the moving party has met this burden, a court must construe all evidence in a light most favorable to the nonmoving party, resolving all ambiguities and inferences in its favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original); Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 90 (2d Cir. 2002). Material facts are those, which given the substantive law, might affect the suit's outcome. Anderson, 477 U.S. at 248.

If the moving party makes a *prima facie* showing that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and put forth "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). In so doing, the nonmoving party may not rely on conclusory allegations or speculation. Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citing D'Amico v.

City of New York, 132 F.3d 145, 149 (2d Cir.1998)); Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). Thus, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (quoting Matsushita, 475 U.S. at 586). Nonetheless, the nonmoving party need not make a compelling showing; it need merely show that reasonable minds could differ as to the import of the proffered evidence. R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997).

## II. The Alleged Breaches of Contract

Plaintiffs' contractual claims are based on the duties of good faith imposed upon contracting parties in transactions governed by the UCC. Section 1-203 provides that "[e]very contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." Further, UCC § 2-305(2) expressly imposes a duty of good faith with regard to setting "open price" terms, such as the one at issue in this litigation. See UCC § 2-305(2) (providing that "[a] price to be fixed by the seller or by the buyer means a price for him to fix in good faith"). "Good faith" in the case of a merchant is specifically defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." UCC § 2-103(j). Of great pertinence here in harmonizing these concepts is official comment 3 to § 2-305, which provides:

> Subsection (2), dealing with the situation where the price is to be fixed by one party rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith. Good faith includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. (Section 2-103). But in the normal case a "posted price" or a future

10

> seller's or buyer's "given price," "price in effect," "market price," or the like satisfies the good faith requirement.

Stated differently, comment 3 interprets the UCC to create a "price in effect presumption" – i.e., a presumption that in the "normal case," the "price in effect" is in good faith as a matter of law.

There is more than just the prompting of the official comment available in applying these provisions of the UCC to this dispute. The slate is far from clean. The recently decided Autry Petroleum Co. et al. v. BF Products North America, Inc., No. 4:05-CV-113 (CDL), 2008 WL 360628 (M.D. Ga. Feb. 8, 2008), has squarely confronted these very provisions of the UCC and helps guide the Court's analysis here. Plaintiffs in Autry were BP-branded "jobbers" who acted as intermediaries in the distribution of BP fuels to dealers. Id. at *1. Like the sales agreements at issue in this case, the contracts in that case required that the jobbers purchase fuel under an open price term (the "Jobber Buying Price"), which was set unilaterally by BP. Id. Similarly to plaintiffs here, the plaintiffs in Autry claimed that BP breached its contract and its good faith duty under the UCC by offering its jobbers a 1% prompt payment discount, but then adding back the cost of the discount program in computing the Jobber Buying Price, effectively eliminating, it was argued, the benefit of the discount. Id. The court, nonetheless, granted summary judgment for BP on the grounds that (1) BP did not breach any duty to provide the prompt pay discount in good faith under its implied duty in UCC § 1-203 and (2) plaintiffs had produced insufficient evidence from which a reasonable fact finder could have concluded that BP breached its duty of good faith under UCC § 2-305 in setting the Jobber Buying Price. Id. at *5. In line with this analysis, the Court addresses (1) whether Exxon breached any duty to provide its rebates in good faith under UCC § 1-203 and (2) whether Exxon breached its duty of good faith in setting the DTT price under UCC § 2-305.

11

## A. Section 1-203 Implied Duty of Good Faith Claim

As recognized in Autry, a claim for breach of the implied duty of good faith under UCC § 1-203 requires proof that a contracting party acted in bad faith with respect to a specific contractual provision. Id. at *4.[18] Autry first found that genuine issues of material fact existed as to whether BP had agreed to provide the prompt pay discount by a course of dealing or course of performance under Georgia's codification of UCC § 1-201. Id. at * 4; see UCC § 1-201(3) (parties' "agreement' is "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act . . . ."). Regardless, the court found that there was no issue of fact as to whether BP breached that agreement, as plaintiffs acknowledged that they received the discount when they paid within ten days, effectively agreeing that they received some benefit from the discount's application, and that they did not receive the discount if they did not pay within ten days. Id. at *5. Furthermore, and more critically, the court found BP did not breach any contractual duty by recouping the cost of the discount as part of the Jobber Buying Price, as nothing in the sales contract prevented BP from recouping the discount or restricted the factors BP could consider in setting its price. Id. To impose such an obligation or restriction upon BP, Autry held, would "have the effect of re-writing the parties' contract, something not authorized or contemplated by [1-203]." Id.

In the instant case, it is not clear from the complaint whether the dealer plaintiffs, like the jobber plaintiffs in Autry, are even claiming that Exxon had a contractual duty to provide them with rebates via a course of dealing or course of performance under UCC § 1-201. For sure, though, plaintiffs claim that Exxon's representations about the rebates amounted to a promise

---

[18] Although the Autry court refers to the implied duty of good faith as falling under as UCC § 2-103, this appears to be a typographical mistake, as the relevant provision is UCC § 1-203.

that Exxon would not recapture the costs of the provided rebates in DTT pricing. In any event, to the extent that plaintiffs do argue that Exxon breached a contractual duty to provide the rebates, any such claim must fail. As in Autry, plaintiffs here concede that they did in fact receive the rebates they earned in any given month as credits on their rent or gasoline invoices. Nor did Exxon breach any duty under § 1-203 by recouping the costs of the rebates in its DTT pricing since, as in Autry, nothing in the dealers' contracts with Exxon prevented Exxon from recouping the costs of the rebates through its DTT pricing or restricted the factors Exxon could consider in setting those prices. Accordingly, any claim for breach of contract that plaintiffs seek to maintain based upon the UCC's implied duty of good faith under 1-203 must fail, and Exxon is entitled to summary judgment on such claims.

## B. Section 2-305 Express Duty of Good Faith Claim

Moving on to the next theory of breach, UCC § 2-305 does impose a separate and independent duty of good faith upon a merchant like Exxon in its setting of an open price term. The dispute in this case largely centers on whether Exxon acted in good faith by charging the "price in effect", within the meaning of § 2-305 as amplified by its official comment 3. In support of their contention that Exxon's "price in effect" was not a price set in good faith, the dealer plaintiffs rely heavily on Allapattah Services, Inc. v. Exxon Corp., 61 F.Supp.2d 1308 (S.D. Fla. 1999) ("Allapattah I"), aff'd, 333 F.3d 1248 (11th Cir. 2003) ("Allapattah II").

The Allapattah litigation arose out of Exxon's alleged inclusion of the costs for credit card processing in its DTT pricing. In the early 1980s, Exxon was facing increased competition from so-called "private branders" who were selling unbranded gasoline on a cash-only basis at prices below those of Exxon's dealers operating in the same market. Allapattah I, 62 F.Supp.2d at 1312. At the same time, Exxon was being squeezed by increased operating costs, including

13

the costs of maintaining a credit card retail sale system. Id. In response, Exxon devised and introduced the DFC program, *supra*, which would (1) reduce the DTT price by an amount to offset the charge incurred by dealers who accepted credit card payment; (2) encourage dealers to implement different prices for cash and credit transactions; and (3) charge dealers a 3% processing fee on all credit card receipts submitted to Exxon. Id. Exxon's dealers were not required to participate in the program (i.e., they were not required to offer a discount for cash to their customers); however, the wholesale price reductions and credit card processing fee applied to all. Id.

The dispute in Allapattah centered on what exactly Exxon had promised its dealers and the legal effect of its commitments. Id. Exxon conceded that "at a minimum, it told its dealers that it would remove from the [DTT] price an amount that 'on average' would offset the charge to dealers for credit card processing[.]" Id. Plaintiffs, however, alleged that Exxon did not do as it promised and, further, secretly divided its dealers into "keepers" and "non-keepers", internally recognizing that its pricing strategy was driving the "non-keepers" out of business. Id. at 1313. Thus, it was contended, Exxon's "double charging" for credit cost recovery, once through the processing fee and again in DTT, advanced Exxon's strategy of closing down dealerships that did not meet Exxon's internal criteria. Id.

The Allapattah plaintiffs contended that Exxon's behavior amounted to a breach of its duty to act in good faith under the contracts and the UCC. Exxon moved for summary judgment on the ground that, since the individual sales agreements gave it the unilateral right to set the DTT price, its pricing methodology could not be the basis for establishing a sales agreement breach. Id. Exxon also argued that it did not breach its good faith obligation in setting the DTT prices because the covenant of good faith imposed only a duty to set a reasonable price, and

14

Exxon's prices were comparable to those of its competitors. Id. at 1313-14. The court, however, denied summary judgment. Id. at 1318. It concluded that, although there may have been a presumption that Exxon's price in effect was set in good faith, this was not the "normal case" under UCC § 2-305 because "the parties' dispute is not over the actual amount of the price Exxon charged for its wholesale gasoline to its dealers, but rather over the manner in which the wholesale price was calculated without considering the doubled charge for credit card processing." Id. at 1322. The court noted that, pursuant to the definitions in UCC § 2-103, Exxon had an obligation with two separate components – honesty in fact *and* the observance of reasonable commercial standards of fair dealing. Id. The court concluded that, if Exxon did double charge in its pricing decisions, it would not have acted "honestly in fact" with regard to its transactions with the dealers. Id. at 1323. Further, as to commercial reasonableness, the court also noted that plaintiffs specifically claimed that Exxon showed bad faith based on its plan to run the "non-keeper" dealers out of business. Id. at 1324.

On appeal, Exxon argued that the district court erred in submitting to the jury the question of whether the dealings presented a "normal case" under the UCC. Allapattah II, 333 F.3d at 1262 n. 16. The Eleventh Circuit affirmed. The affirmance focused on the fact that the dealers had alleged Exxon was attempting to drive some of them out of business and as such did not act in good faith. Id. Given the allegation and the proof offered at trial to support it, the court of appeals "agree[d] with the district court that whether this case constituted a normal case was a factual issue necessary to determine whether Exxon acted in good faith. It therefore was a question for the jury." Id.

Both sides here cite Allapattah. That it be seen in the light shone by the dealer plaintiffs is absolutely essential to the survival of their claims. Specifically, they contend that Exxon's

15

inclusion of the cost of the rebate programs in Exxon's DTT prices raises a classic factual

inquiry of whether or not Exxon acted "honestly in fact" and that Allapattah, therefore,

commands a trial not summary dismissal. According to plaintiffs, the various representations

that Exxon made, which stressed that the rebates would be beneficial and profitable to dealers,

essentially constituted a promise that Exxon was bearing the costs of the rebate program itself

and that it would *not* add the costs back in DTT pricing. The dealers do acknowledge that Exxon

could have spread the costs of providing rebates across its business lines in general, but they

protest that, by specifically adding those program costs to DTT, Exxon effectively and

knowingly caused all of its dealers to "earn" no rebates, or less rebates than expected, when

netted against the DTT add-ons. See Tr. of Oral Argument at 54:14-23, 79:18-80:1, 90:7-17.

Such pricing methodology, the dealers argue, was dishonest and commercially unreasonable or,

as in Allapattah, at least raised a triable issue that it was.

Exxon, for its part, minimizes Allapattah as a "minority" rule when viewed in the light

the dealers advocate. Relying primarily on the decision of the Texas Supreme Court in Shell Oil

Co. v. HRN, Inc., 144 S.W.3d 429 (Tex. 2004) and its antecedents, Exxon counters that the

majority of courts have found, as required by UCC § 2-305, that the "price in effect" under an

open price term is a good faith price as a matter of law if it is nondiscriminatory and within the

range of other competitive prices – in other words, that evidence of "subjective" bad faith alone

is not enough to overcome summary judgment.[19] "It is abundantly clear[,]" the HRN court

---

[19] See, e.g., Tom-Lin Ents., Inc. v. Sunoco, Inc. (R&M), 349 F.3d 277, 281-82 (6th Cir.
2003); Havird Oil Co., Inc. v. Marathon Oil Co., Inc., 149 F.3d 283, 290-91 (4th Cir. 1998);
Richard Short Oil Co., Inc. v. Texaco, Inc., 799 F.2d 415, 422-23 (8th Cir. 1986); Wayman v.
Amoco Oil Co., 923 F.Supp. 1322, 1346-1350 (D. Kan. 1996), aff'd 145 F.3d 1347 (10th Cir.
1998) (Table); T.A.M., Inc. v. Gulf Oil Corp., 553 F.Supp. 499, 509 (E.D. Pa. 1982); Adams v.
G.J. Creel and Sons, Inc., 320 S.C. 274, 278-79 (S.C. 1995). But see Wilson v. Amerada Hess
Corp., 168 N.J. 236, 254 (N.J. 2001); Mathis v. Exxon Corp., 302 F.3d 448, 456-59 (5th Cir.

16

stated, "that the chief concern of the UCC Drafting Committee in adopting § 2-305(2) was to prevent discriminatory pricing – i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons." See HRN, 144 S.W.3d at 434 (quoting Wayman, 923 F.Supp. at 1346-47). Premising a breach of contract solely upon alleged subjective motives, the HRN court found, "injects uncertainty into the law of contracts and undermines one of the UCC's primary goals – to promote certainty and predictability in commercial transactions." Id. at 435 (internal citations, quotation marks, and alterations omitted). Moreover, a subjective bad actor motivation analysis would negate the effect of the "safe harbor" in comment 3 to § 2-305 and conflict "with the drafters' desire to eliminate litigation over prices that are nondiscriminatory and set in accordance with industry standards." Id. Therefore, as HRN expressed, "allegations of dishonesty under this section must also have some basis in objective fact which at a minimum requires some connection to the commercial realities of the case." Id. at 435-36. Relying on this analysis, Exxon asserts summary judgment is warranted here because plaintiffs have alleged only "subjective" bad faith (i.e., dishonesty in fact) and not "objective" bad faith (i.e., discrimination among dealers or setting prices that are outside the range of its competitors).

Alternatively, Exxon argues that, even if this Court were to follow the "minority" rule of Allapattah, summary judgment should nonetheless be granted because plaintiffs have failed to offer any evidence of dishonesty in fact. It is here that Autry rides to the fore. Autry held that BP, the wholesaler there, was entitled to summary judgment even without the benefit of the "normal case" presumption under comment 3, as the BP jobbers had produced insufficient evidence that BP had acted in bad faith in setting the open price term. Id. at *7. First, as to

2002); Marcoux v. Shell Oil Prods. Co. LLC, 524 F.3d 33, 50-51 (1st Cir. 2008). There is no controlling law on point in New York, Maryland, Pennsylvania or in the Second Circuit.

17

"honesty in fact," the court noted that in Allapattah I, the dealers had produced evidence that "Exxon undertook an affirmative obligation to price its wholesale gasoline in a particular way, failed to perform its obligations, and then lied to its dealers in an effort to avoid its obligation and intentionally drive selected dealers out of business." Id. at *8. By contrast, the Autry plaintiffs, as is the case with the Exxon dealers here, conceded that the wholesaler "made no promise that it would calculate the Jobber Buying Price by any particular method, and every jobber that paid promptly actually received a one percent discount from the Jobber Buying Price." Id. Further, the Autry court noted, in Allapattah II,[20] the Eleventh Circuit seemed to rely only on the allegations that Exxon was using its pricing methodology to drive certain dealers out of business as evidence of Exxon's bad faith. Id. at *9. Unlike the dealers in Allapattah, however, the Autry plaintiffs did not allege any bad act beyond the discount program cost recapture by BP nor did they direct the court to any "evidence that would support their contention that Defendant acted with subjective dishonesty in setting the Jobber Buying Price." Id.

Second, as to "commercial reasonableness," the Autry court noted again that, unlike in Allapattah I, the BP case "lack[ed] the breach of a specific pricing promise that could be construed as evidence that Defendant acted in a commercially unreasonable manner." Id. The court noted that "[w]hen Plaintiffs' claims are reduced to their essence, they reveal that Plaintiffs' grievance is that Defendant should not have recouped the cost of the discounts by adding them to the Jobber Buying Price. While this argument is superficially appealing, Plaintiffs do not direct the Court to any evidence indicating that Defendant's actions were commercially unreasonable." Id. at *10. On the record before it, the court found: (1) plaintiffs

---

[20] Allapattah II was binding circuit precedent in Autry, decided in the Middle District of Georgia.

did not know how other companies set their prices or whether they recouped the costs of any prompt payment discounts; (2) there was no meeting of the minds as to how BP would set the price; and (3) plaintiffs did not expect BP to share the details of its pricing methodology with them. Id. In other words, "Plaintiffs in this case give no objective basis for their expectation that it was commercially unreasonable for Defendant to consider the prompt payment discount when it set its Jobber Buying Price." Id.[21]

When the Exxon dealer plaintiffs here peer into the mirror they spy the BP jobber plaintiffs in Autry looking back. The consonance of the two cases in fact and law must be reflected in the result. As in Autry, this Court finds, even assuming *arguendo* that subjective bad faith alone can constitute a breach of the duty of good faith under UCC § 2-305, that plaintiffs here have failed to set forth any evidence that would create a triable issue as to Exxon's dishonesty. Unlike Allapattah, where evidence was admitted to support plaintiffs' contentions Exxon breached a specific promise to calculate its DTT price in a particular way and lied about doing so, as well as evidence that Exxon was using its DFC program to eliminate some of its dealers, plaintiffs here do not point to any separate ulterior motivation on the part of Exxon or any promise that Exxon made or breached when calculating the DTT price. Rather, the record evidence demonstrates that Exxon promised only that its dealers would earn rebates if they met certain volume levels of sales – rebates that plaintiffs concede they did receive – and that Exxon made *no* promise as to how DTT prices would then be calculated. In other words, plaintiffs'

---

[21] On plaintiffs' motion for reconsideration, the Autry court again rejected their arguments, noting that their "proffered evidence of dishonesty in fact and commercial unreasonableness consists primarily of statements of their subjective belief that Defendant acted unfairly and contrary to the parties' expectations when it recouped the prompt payment discount when setting the Jobber Buying Price. The problem with Plaintiffs' argument is that it would permit one party's notion of 'unfairness' to trump the express terms of the parties' contract, which permit the Defendant to unilaterally set the Jobber Buying Price." Autry Petroleum Co. v. BP Prods. N. Am., Inc., No 4:05-CV-113 (CDL), 2008 WL 693800, at *1 (M.D. Ga. Mar. 12, 2008).

allegation that Exxon acted "dishonestly" is, at most, based only on their subjective belief that Exxon, because of what it did not say in promoting its rebate programs, would not add back those costs, as opposed to any representation actually made by Exxon.[22]

Second, as to commercial reasonableness, plaintiffs do not point the Court to any evidence to show that Exxon's conduct violated the parties' commercially reasonable expectations. See Autry, 2008 WL 360368 at *10. Again, in contrast to Allapattah, plaintiffs do not allege breach of an explicit pricing promise or make allegations of discriminatory pricing. Id. at *9. Rather, plaintiffs essentially claim that Exxon should not have added back the costs of its rebates to the DTT price, period. As the court found in Autry, however, while such an argument may be "superficially appealing," there is no evidence in the record that adding back the cost of the rebates in calculating the DTT was commercially unreasonable. Id. Rather, as in Autry, the record evidence here shows (1) that plaintiffs did not know how Exxon set its prices much less know how Exxon's competitors set their prices or whether they recouped the costs of their rebates; (2) that there was no meeting of the minds between Exxon and its dealers as to how Exxon would set the DTT price; and (3) that plaintiffs did not expect Exxon to share its pricing methodology with them. Id. In short, plaintiffs here are in the same stymie as the plaintiffs in Autry – they can "give no objective basis for their expectation that it was commercially unreasonable for Defendant to consider the [rebate] when it set its [DTT] price." Id. at *10.

In their last gasp, plaintiffs claim that requiring evidence of a specific promise by Exxon would effectively allow Exxon to mislead its dealers into thinking that Exxon was bearing the

---

[22] Nor, of course, have plaintiffs alleged that Exxon engaged in discriminatory pricing or was trying to drive certain dealers out of businesses – the type of behavior that, according to the Eleventh Circuit in Allapattah II, is what took Exxon's behavior out of the "normal case" presumption articulated in comment 3 to section 2-305. See Allapattah II, 333 F.3d at 1262 n.16; Autry, 2008 WL 360368 at *9; Marcoux, 524 F.3d at 50.

costs of the rebate programs itself and not recouping those costs, so long as they were not too blunt about it. Quite to the contrary, what matters is not the degree of bluntness but the words of the contract. Those words gave Exxon the unilateral right to set the DTT price – and given plaintiffs' concession that Exxon could consider any of its multivariate costs in setting the DTT price,[23] the representations by Exxon to plaintiffs about the rebate program, even if silent about Exxon's recouping of the cost, simply cannot be considered to be misleading. Merchant contracts are designed to provide certitude. The claim by the dealers that Exxon somehow misled them amounts only to their "subjective belief that [Exxon] acted unfairly and contrary to the . . . expectations" they had internalized as a result of the rebate presentations, which "would permit one party's notion of 'unfairness' to trump the express terms of the contract, which permit [Exxon] to unilaterally set the [DTT] Price." Autry, 2008 WL 693800 at *1. Such subjectivism, it is clear, cannot be sanctioned for in "commercial transactions governed by the UCC . . . the question is not what is fair but what comports with the contract." Id. (quoting PSI Energy, Inc. v. Exxon Coal USA, Inc., 17 F.3d 969, 974 (7th Cir. 1994)) (internal alternations and quotation marks omitted).

Simply stated, this Court must "respect and enforce the parties' bargain as expressed in their Contract." Autry, 2008 WL 360368 at *10. Plaintiffs have not produced any evidence extrinsic to their bald assertion that the silent recouping of rebate costs in Exxon's DTT pricing alone was unfair and commercially unreasonable to establish that Exxon acted with dishonesty in fact or that their pricing methodology was commercially unreasonable. Rather, the evidence

---

[23] That is, plaintiffs effectively concede that if Exxon's non-rebate program related costs prompted Exxon to raise its DTT price, such pricing increases would be permissible even if the DTT price increase had the identical rebate-negating impact alleged here. See Tr. of Oral Arg. at 59:20-60:3. This concession is an acknowledgment that dealers recognized they could actually pay more for their gasoline after the rebate went into effect than before.

indicates that Exxon acted in accordance with the contract in setting the open price term and in remitting rebates to the dealers. Id. Exxon is therefore entitled to summary judgment. The dealers' claims asserting a breach of contract action for failure to set the open price term in good faith is supported neither by the law nor the undisputed facts.

## CONCLUSION

For the reasons stated above, the Court grants Exxon's motion for summary judgment and orders the complaint dismissed, except as to plaintiffs Holbrook and Verner. As to them, their claims are withdrawn voluntarily and are dismissed with prejudice.

The Clerk is directed to enter judgment for defendant and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
October 17, 2008

ERIC N. VITALIANO
United States District Judge